## Ex parte ADAMS.

No. 9070—Opinion Filed Oct. 9, 1917.

Rehearing Denied Dec. 4, 1917.

(168 Pac. 1004.)

(Syllabus)

**Parent and Child—Custody—Fitness.**

Where a father is shown to be an improper person to have the care, custody, and training of his infant 'child, he will not be awarded the custody of such child as against the maternal grandmother, who is shown to be a fit person to properly rear and train said child.

Miley, J., dissenting.

Error from District Court, Garvin County; F. B. Swank, Judge.

Habeas corpus by F. Buel Adams, Sr., against Julia G. Campbell, to obtain custody of his infant son, F. Buel Adams, Jr. Judgment .for petitioner, and respondent brings error. Reversed and rendered.

Blanton· & Andrews, for plaintiff in error.

W. R. Wallace and S. D. ·Williams, for defendant in error.

BRETT, J. This is an acion by F. Buel Adams, Sr., who will be referred to as petitioner, to obtain custody of his infant son F. Buel Adams, Jr. The respondent, Mrs. Julia G. Campbell, is the maternal grandmother of the child. Its mother died in 1916, and the grandmother has had custody of the child since her death, and had the care of it to a large extent even during the lifetime of its mother, and she resists the petitioner having the custody and control of the child on the ground that he is unfit, and we ·think the record bears out this contention.

The father of the child began courting a woman within three months after the death of the child's mother, and in about four months thereafter married ·her. Whether she was the wife of another man at the time this courtship began or not is not clear, and the ·petitioner states he does not know whether she had been divorced from her former husband at the time he began courting her or not. But at any rate it was only about a month from the time the courtship began till he married her, and the record shows she had been divorced only about a month before her marriage to the petitioner. And he asks that the child be taken from the grandmother, and turned over to him and his newly found spouse.

The mother of this child, from the testimony of the petitioner and letters introduced, seems to have been most tenderly devoted to the petitioner. And while he may think it was only a matter of taste, as to whether he began courting within three months or three days after the death of this tenderly affectionate wife, yet the writer of this opinion thinks it goes further, and exhibits a character deficient in appreciation of the higher, better, nobler sentiments of life—sentiments which this child is entitled to have instilled into its young and plastic mind. And a man who can so soon forget the tender caresses of a most affectionate and faithful wife could hardly be expected to have a more abiding interest in her infant child.

Again, one witness testifies that within a few days after the death of his faithful

wife, petitioner told him that ne and one of his brothers-in-law took two lewd wo men to a hotel at Wynnewood in the small hours of the night, and there caroused with them. The petitioner denies having made this statement, but admits that he and his brother-in-law were at the hotel, and the hotel register which he admits carries the genuine signatures of himself and brother-in-law shows the name of the brother-in-law registered, then immediately under his name, apparently in his handwriting, the names of the two women, and immediately under their names, the name of the peti tioner appears. And the two men and the two women were assigned adjoining rooms. Petitioner says, however, that he and his brother-in-law reached the hotel in the morning of that day, and not at night, and only remained in the town for a few hours; that his brother-in-law registered and took a room immediately upon their arrival; that he went to see an attorney for a few minutes on business, and did not register until he returned from the office of the at torney, and that shortly thereafter his brother-in-law, himself, and the attorney started for Pauls Valley. And the only rea son, he says, that he registered at all, was, that it was very dusty, and he was "very dirty from the drive," and only wanted a room in order that he might wash and clean up, and used it for no other purpose. This all may be possible, but it is hardly proba ble that under the circumstances he would have gone to see the attorney before clean ing up. And it is still less probable that he would have registered only for the pur pose of using the room his brother-in-law already had to wash and clean up. His brother-in-law certainly would have permit ted him to use the room for this purpose without his registering. And it is also re markable that the names of the petitioner and his brother-in-law and the two women should be the last names on the register for that day, if they arrived in the morning. The register would indicate that they were the last to arrive on that day. At least it is clear they were the last to register for that day. The petitioner's testimony, admis sions, and explanations, we think, instead of clearing him of the charge that he and his brother-in-law were in the hotel with these women, tends to confirm it. Instead of his testimony strengthening his denial, it tends to confirm the truth of the state ment the witness swears he made to him, that he was there with these women. And that only within a few days after the death of this child's mother.

It is in evidence that the petitioner has another child by a former marriage, which he has never taken to his home since his last marriage. And it is insisted by re spondent, that his interest in the child in volved in this litigation is due to the fact that it was valuable property. However that may be, under the record as above set out, in connection with other matters in the record which we prefer not to mention, we think the petitioner is not a fit person to have the care, control, and training of his child during the formative period of its life.

The petitioner relies on Jamison v. Gil bert, 38 Okla. 751, 135 Pac. 342, 47 L. R. A. (N. S.) 1133, which was a contest for the custody of a child between the father and maternal grandmother, just as in this case; but there the similarity between the two cases stops. In that case the father was shown to be a man of good moral character but poor, and the grandmother relied on the fact that she was better able to pro vide for the child than its father. And this court properly held that it would not de prive a parent of the custody of his child, simply because on account of his financial condition he could not provide for it as well as a stranger, but that the parent shall be deprived of the custody of his child as against a stranger only when it is made to affirmatively appear he is unfit. And the record in this case, we think, does show affirmatively the father to be unfit.

The order of the district court awarding the custody of the child, F. Buel Adams, Jr., to the father, F. Buel Adams, Sr., is reversed, and it is the order of this court that the respondent, Mrs. Julia G. Camp bell, have the care, custody, and control of said child, and that the father may be per mitted to visit said child on convenient and proper occasions.

SHARP, C. J., and KANE, TURNER, and OWEN, JJ., concur. HARDY, THACKER, and RAINEY, JJ., concur in the conclusion. MILEY, J., dissents.